AO-106 (Rev: 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*INFORMATION ASSOCIATED WITH*<br>*SEELAN8002@GMAIL.COM*<br>*THAT IS STORED AT PREMISES CONTROLLED BY*<br>*GOOGLE LLC ("GOOGLE")* | )<br>)<br>)<br>)<br>) |

Case No. 23 mj-108·CDL

**FILED UNDER SEAL**

*FILED*

FEB 22 2023

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A." This court has authority to issue this warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A).

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| **18 U.S.C. § 1343** | **Wire Fraud** |
| **18 U.S.C. § 1349** | **Conspiracy to Commit** |

The application is based on these facts:
   **See Affidavit of Jeffrey Masiak, attached hereto**.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ____ days (give exact ending _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Jeffrey Masiak, DHS/ICE/HSI
*Printed name and title*

by phone

Sworn to ~~before me and signed in my presence~~.

Date: February 22, 2023

*Judge's signature*

City and state:   __Tulsa, Oklahoma__

Christine D. Little, U.S. Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **INFORMATION ASSOCIATED WITH** **SEELAN8002@GMAIL.COM THAT IS** **STORED AT PREMISES CONTROLLED** **BY GOOGLE LLC ("GOOGLE")** | Case No. _____ <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jeffrey Masiak, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent ("SA") employed by the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since July 2010. I am a graduate of the Criminal Investigator Training Program and the ICE Special Agent Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I am currently assigned to the Counterproliferations ("CPI") Task Force in the HSI Baltimore (MD) field office ("HSI Baltimore").

2.      My responsibilities include the investigation of violations of law, including the submissions of false and fraudulent statements to the U.S. government. I have experience investigating individuals who have participated in grant fraud, contract fraud, false claims, and false statements against the U.S. government, to include crimes against the Department of Energy ("DOE"), National Aeronautics and Space Administration ("NASA"), and National Science Foundation ("NSF"). In addition, I have investigated criminal violations related to money laundering, smuggling, wire fraud, mail fraud, and other crimes. I also have participated in criminal investigations involving controlled-delivery operations, undercover transactions, the

1

execution of search and arrest warrants, the review of consensually recorded conversations, the cultivation and use of confidential informants, and various types of physical and electronic surveillance.

3.     I make this affidavit in support of an application for a search warrant for information associated with SEELAN8002@GMAIL.COM ("SUBJECT ACCOUNT-1") that is stored at premises controlled by GOOGLE, an email provider headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require GOOGLE to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. I have not, however, intentionally omitted information that would tend to defeat a determination of probable cause.  The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals.  All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that in or about and between January 2021 and the present, United States citizens Thavaselan (a/k/a Seelan) SUBRAMANIAM and Reginald (a/k/a Reg) BENNETT (collectively, "the Defendants") committed violations of Title 18, United States Code, Section

1343 (wire fraud); and Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud) (collectively, the "Subject Offenses"), and that evidence of the Subject Offenses will be found within SUBJECT ACCOUNT-1.

## PROBABLE CAUSE

**Investigation Background**

6.     In or about September 2021, HSI and the Department of Veterans Affairs, Office of Inspector General ("VA-OIG") opened an investigation into United States citizens Thavaselan SUBRAMANIAM (a/k/a Seelan SUBRAMANIAM), Reginald BENNETT (a/k/a Reg BENNETT), and William WADE, based on information that they, through their companies EAST WEST INTERNATIONAL MARKETING & CONSULTING LLC ("EWI") (SUBRAMANIAM and BENNETT's company)  and SARATOGA ADVISORS GROUP LLC ("SAG") (WADE's company) were representing to foreign government officials, to include officials from Thailand, Australia, and Vietnam,[1] that they have the ability to provide ongoing "donations" of COVID-19 vaccines in large quantities; EWI represented it would facilitate these government-to-government donations in exchange for specified per-dose fees, to include certain fees paid in advance of obtaining the agreed-upon doses.

---

[1] Media reports during the summer of 2021 discussed how these countries had suffered delays in rolling out vaccination plans. *See, e.g.*, What's Gone Wrong with Australia's Vaccine Rollout?, BBC News, https://www.bbc.com/news/world-australia-56825920 (June 17, 2021); A Mass Inoculation Campaign in Thailand Stumbles Amid a Severe Outbreak, New York Times, https://www.nytimes.com/2021/06/14/world/thailand-shortage.html (June 14, 2021); Slow Vaccine Rollout Creates Risk for Pandemic Standout Vietnam, Bloomberg News, https://www.bloomberg.com/news/articles/2021-06-01/vietnam-may-lose-economic-advantage-without-herd-immunity-govt (May 31, 2021).

7.      According to open-source research, EWI is an Oklahoma Foreign Limited Liability Company[2] that was registered with the Oklahoma Secretary of State on April 29, 2020, with SUBRAMANIAM listed as the company's registered agent and business location listed as 8023 E. 63rd Place, Suite 540, Tulsa, OK, 74133.  EWI has an active website (www.ewimc.net) that lists its contact address as 8023 E. 63rd Place, Suite 540, Tulsa, OK 74133.  Additionally, my research indicates that SUBRAMANIAM is associated with the address 11715 South Fulton Avenue in Tulsa, OK, and BENNETT is associated with the address 2044 Rose Court in Norman, OK.  The investigation to date—to include information obtained from current government officials, executives at Pfizer and Johnson & Johnson, and open-source research—indicates that the Defendants' claims regarding access to, and their capability to facilitate donations of COVID-19 vaccine to these foreign governments are undoubtedly false.  Instead, there is evidence this was a scheme to defraud these foreign governments.

8.      According to the Centers for Disease Control and Prevention ("CDC") website,

> [a]t this time, *all COVID-19 vaccine in the United States has been purchased by the U.S. government (USG) for administration exclusively by providers enrolled in the CDC COVID-19 Vaccination Program and remains U.S. government property until administered to the recipient.*  Only healthcare professionals enrolled through a health practice or organization as vaccination providers in the CDC COVID-19 Vaccination Program (and authorized entities engaged in shipment for the Program) are authorized to lawfully possess, distribute, deliver, administer, receive shipments of, or use USG-purchased COVID-19 vaccine. *Other possession, distribution, delivery, administration, shipment receipt, or use of COVID-19 vaccine outside the parameters of the Program constitutes, at a minimum, theft under 18 U.S.C. § 641, and violation of other federal civil and criminal*

---

[2] EWI is also registered in Wyoming.  SAG is a registered business in New York with an active company website (www.sagrpllc.com).

> *laws. Violators are subject to prosecution to the full extent of the law.*

*See* CDC website, https://www.cdc.gov/vaccines/covid-19/provider-enrollment.html (last viewed January 17, 2023) (emphasis added).

9.      On or about October 21, 2021, the investigative team interviewed the Senior Policy Advisor for Global COVID-19 Response at the White House regarding, in part, the United States' COVID-19 vaccine donation policies and practices, and she confirmed that: (1) the White House COVID Team coordinated excess COVID-19 vaccine supply, (2) all COVID-19 vaccine donations were handled at the federal level, (3) all donations from the United States to foreign governments were coordinated through the White House COVID Team, and (4) no private entities had been granted the authority to act on behalf of the United States government to broker vaccine donations.[3]

**Australian Donation Pitch**

10.     In or about September and October of 2021, HSI Bangkok received information from Pfizer about a COVID-19 vaccine donation offer to an Australian government official, made by individuals on behalf of SAG and EWI in or about August 2021.  The Pfizer Senior Manager for Global Security told the investigative team that Pfizer has seen various COVID-19 vaccine donation offers over the past year by private entities, all or most of which they suspect to be fraudulent in nature.  He noted that the companies involved seemed to be newly formed businesses,

---

[3] There had been reporting in the media about such restrictions as well.  *See, e.g.*, U.S. Communities Want to Share Unused Vaccine With Mexico, But the White House Won't Let Them, The Washington Post (Oct. 22, 2021), https://www.washingtonpost.com/world/ *2021/10/22/mexico-border-vaccine/* ("The White House says legal liability means vaccines can be exported only by the federal government. . . . 'Given chain-of-custody considerations, moving doses out from more than 80,000 providers would involve significant legal and logistical challenges . . . . [The] process is being led at the federal level and states have been advised they should not be sending any doses internationally, due to these complex factors.'")

and/or to not have pre-existing pharmaceutical connections.  Pfizer confirmed the company does not have a business relationship with EWI or SAG.

11.    Pfizer provided information regarding one such company, a wine maker in South Australia, which had contacted officials from the Australian government with a vaccine donation pitch on behalf of EWI and SAG.  Pfizer forwarded to HSI an email chain and several document attachments regarding the pitch.  The original message was from the Australian wine maker (drur@koonara.com), dated August 9, 2021, and was addressed to the entities of the Australian government (@finance.gov.au, @aph.gov.au).  The email stated, in part,

> Hi,
> Thanks for the Chat.  See below the video recorded by Jed [Schwimmer] from Innovation Project (one of Australia's biggest mask suppliers) with **East West International (https://ewimc.net/team/), one of Pfizer's larger distributors in the US [sic].  The two people talking are CEO Seelan Subramaniam and COO Reg Bennett.**  The others on the call are major Aussie/HK vaccine & Medical importers that help SAG (see attached), one of whom just lost his friend to COVID, and are keen in making sure Australia has more vaccines for their friends & family.  **Attached are the documents they have usually needed for deployment in developing countries, but I have convinced them that since 50% of Australia is in lockdown, that constitutes an emergency enough to allow the donation of 525,000 Pfizer and Moderna (50/50 split) to be available this week, with availability of up to 1/2 mil a week.**
>
> **It is currently being housed in a US Govt facility [sic] South Carolina,** which will need a diplomatic passport to assess it in person.  Batch numbers given by them can be a 1st step verification though.

(Emphasis added).

12.    Several days later, on or about August 13, 2021, the email and materials were forwarded by the wine maker to the Australian Public Health official leading Australia's COVID-19 response effort, and thereafter to the Pfizer government affairs lead for Australia and New Zealand on or about August 19, 2021.

13.     The message attachments to the email included documents describing EWI and SAG's purported donation program, and a video file showing part of a Zoom call between SUBRAMANIAM, BENNETT, and others regarding EWI and SAG's purported capabilities. EWI and SAG state or imply in these materials that they are working on behalf of the United States Government in executing their COVID-19 vaccine donation activities. Additionally, as discussed further below, several of the documents list SEELAN@EWIMC.NET and RBENNETT@EWIMC.NET as the email addresses to contact for SUBRAMANIAM and BENNETT, respectively, to conduct business with EWI. Below are summaries of the relevant portions of these attachments:

a.  A PDF titled "Deployment Vaccine Order" included logos for EWI as well as logos for the major U.S. vaccine manufacturers (Pfizer,[4] Johnson & Johnson, and Moderna), contact information for EWI, SUBRAMANIAM, and BENNETT (8023 E. 63rd Pl, Suite 540, Tulsa, OK 74133, USA; SEELAN@EWIMC.NET (918) 901-9501; RBENNETT@EWIMC.NET (405) 208-1060), and represented that the

---

[4] On or about October 21, 2021, Pfizer executives told the investigative team that, although the Pfizer logo included on the previously described PDF titled "Deployment Vaccine Order" is no longer current, it was the former Pfizer trademark and was used without the company's permission.

On or about November 8, 2021, I checked EWI's website and found that it included a webpage containing Pfizer's logo that explicitly stated that EWI can fulfill "Government to Government" sales of the Pfizer vaccine. *See https://ewimc.net/pfizer-biontech-covid-19/.* Further, the webpage implied that EWI worked with Pfizer to develop the vaccine. *Id.* ("Developing the Pfizer-BioNTech COVID-19 vaccine is only possible through the dedicated work of thousands of individuals and those who volunteer to take part in research. We are grateful to all of our clinical trial investigators and their study teams who are partnering with us in this effort and to all of the participants and their families who have and will volunteer to help make a difference for society."). A similar page was included for the Johnson & Johnson vaccine as well. *See https://ewimc.net/johnson-johnson-janssen-2/.* I last visited these websites on or about January 17, 2023, and they were still active.

"COVID-19 Vaccine Global Deployment Program" is "[a] full turn-key service program—vaccines delivered quickly. **Government-to-Government,**" and "includes vaccines from Pfizer, Moderna or Johnson & Johnson (based on availability). **Readily available stock, in the United States**" (emphasis added). The available properties of the PDF identify BENNETT as the author and the creation date as July 1, 2021.

b. A Word document titled "East West International – SOP US Mixed Allocation" provided the process for all vaccine orders, stating, in part, that the vaccine lot included Moderna and Pfizer vaccines, and implying that EWI was acting on behalf of the United States Government, to include: **"This is a qualified vaccine provider – the buyers mandate MUST vet the buyer prior to bringing the request to East West International. All requirements must be met before moving to the next step. Please -serious requests only. Current allocations are limited to Government-to-Government purchases"** (emphasis added). The document concludes by stating "Questions related to the above can be sent to- Seelan Subramaniam, PhD [SEELAN@EWIMC.NET] Reg Bennett [RBENNETT@EWIMC.NET]" (emphasis added). The available properties of the Word document identify BENNETT as the author and the creation date as July 15, 2021.

c. A PDF titled "SAG Team Overview" included a logo advertising the company as a Service-Disabled Veteran Owned Small Business, and provided information regarding, in part, its "Concept of Operations" (e.g., "Provide delivery of US made

Vaccines and Testing services for the Philippines[5] starting in 5-7 days"; "525,000 Vaccines [sic] our ultra-cold storage, available for assisted delivery & implementation") and its "End-to-End Capabilities" (e.g., "Ultra-low freezers with storage capacity for over 1 million doses"; "Mobile Units-distribution team including one nurse, one paramedic, medical assistants (staffed based on number of vaccines to be administered), security personnel, secure date collection and entry personnel, access to physician provider at all times"). The available properties of the PDF identify BENNETT as the author and the creation date as July 30, 2021.

d.  A Word document titled "Purchase Agreement Moderna Pfizer Draft Deployment" included the same contact information for EWI: for SUBRAMANIAM, SEELAN@EWIMC.NET; and for BENNETT, RBENNETT@EWIMC.NET. The document appears to be a template purchase agreement, which identified EWI as the "Solution Provider" and stated, in part, "WHEREAS, Solution Provider, **confirms its ability to facilitate the safe delivery and ground support services of vaccine integrity, safety and security for host nation inoculation of Moderna & Pfizer Covid-19 vaccines** to the people of (INCLUDE COUNTRY)," and later specified that the fees associated with the purchase agreement included a $35,000 down payment and $22.50 per dose of vaccine. The purchase agreement specifies that "**Client is willing and able to accept up to 1 million doses per week. Solutions Provider will facilitate doses as soon as US Federal government release for shipment is processed,** and will transport as many doses immediately

---

[5] HSI is currently following up to determine whether a similar donation pitch was made to the government of the Philippines.

available…" (emphasis added).  Advanced fees contemplated by the agreement included the down payment as well as that "25% payment is due upon receipt of Shipping Manifest providing flight confirmation."  The available properties of the Word document identified BENNETT as the last person to modify the document on or about July 31, 2021, and the creation date as July 24, 2021.

e.  A video file, MP4, titled "zoom_Pfizer_East_West_8_Aug_2021_recap" features a recording of a Zoom video call on or about August 8, 2021 between six people, to include individuals who self-identified as SUBRAMANIAM and BENNETT, and the individual identified as the Australian wine maker.  In the recording, SUBRAMANIAM stated, in part: "This is Seelan Subramaniam with East West International.  **We are the contractor for this service provider.  Our service provider is SAG Team** out of Virginia, Washington, DC.  They are ex-Special Forces within the former U.S. Navy or Marines so they have deployed a lot vaccines around the world for other than COVID-19 vaccines. So currently they are working to deploy COVID-19 vaccines to many nations.  **So this product is actually a donation from the U.S. government from Health and Human Services and the Department of Defense that they have access to**[6] to the right countries that request for these donations…We look forward to working with you in the near future to get this thing done quickly.  Reg, you want to add anything to that?"

---

[6] As mentioned above, the Senior Policy Advisor for Global COVID Response at the White House confirmed that there are currently no private entities authorized to act on behalf of the United States Government to facilitate donation of COVID-19 vaccines.

BENNETT then stated, in part: "Yeah, so I think the only thing that Dru asked as well, **there are roughly for the first order, we have 525,000 vaccines, half of those are Moderna, half of those are Pfizer, that would be available for the first week.   And those are actually in a deep freeze storage in a U.S. government site and that would be the first available donations.   After that, we can do roughly about another half million a week and we can ramp that up.**" (emphasis added)

**Vietnamese Donation Pitch**

14.     On or about December 2, 2021, I interviewed David Nguyen, an employee of the United States Patent and Trademark Office. Nguyen confirmed key elements of the scheme involving BENNETT/SUBRAMANIAM/EWI outlined in this affidavit and provided information indicating that they remained operational at that time.  Nguyen is a Vietnamese refugee and fluent Vietnamese speaker with connections in Vietnam; he explained he is well-known for his longstanding non-profit work and his diplomatic ties to Vietnam.

15.     Relevant to this affidavit, in or around June or July of 2021, an intermediary connected BENNETT to Nguyen to request Nguyen's assistance in facilitating shipments of alleged donations of U.S. Government-owned COVID-19 vaccine to Vietnam.  According to Nguyen, since that time he has spoken on numerous occasions by telephone with BENNETT and SUBRAMANIAM about their purported business operations.  Nguyen described the terms of the business deal SAG and EWI had tried to complete with Vietnam, which sounded consistent with those described in the purchase agreement PDF sent to Australia, outlined above in paragraph 13.d. According to Nguyen, BENNETT and SUBRAMANIAM identified WADE and SAG as the key conduits for transporting and delivering the vaccine to Vietnam and other countries.  Nguyen

11

confirmed that he had contacted a Vietnamese foreign official at the behest of BENNETT and SUBRAMANIAM; however, Nguyen said he was never satisfied that BENNETT and SUBRAMANIAM had the authority or ability to deliver the vaccines because they could not provide adequate documentation.  Regarding compensation, Nguyen understood that, if the deal were made, he and the intermediary who introduced Nguyen to BENNETT would each receive about 25 cents per vaccine dose as a commission.  Nguyen stated that, as recently as on or about December 2, 2021, BENNETT had telephoned Nguyen seeking Nguyen's assistance in contacting foreign authorities, such as officials in Vietnam.

16.     Following the interview, Nguyen forwarded me emails between himself and SUBRAMANIAM     at     SEELAN@EWIMC.NET     and/or     BENNETT     at RBENNETT@EWIMC.NET regarding donation of COVID-19 vaccine.

**Trinidad and Tobago and Honduras Pitches**

17.     In November of 2022, HSI Baltimore received information from Johnson & Johnson that in or about April or May of 2021 EWI had indicated to representatives of Trinidad and Tobago and Honduras that EWI could supply doses of the Johnson & Johnson Janssen vaccine from a manufacturing site in India, Biological E. Limited.

18.     According to information obtained from Johnson & Johnson, at the time, Biological E. Limited did not manufacture the product or have the right to sell any vaccine.

19.     In addition, according to information obtained from Johnson & Johnson, the company was only distributing its vaccine to national governments, directly or through multinational organizations of national governments, at the time. Further, these governments had generally agreed to not resell or further transfer doses without consulting with Johnson & Johnson.

**Search Warrant Served on Oath Holdings, Inc.**

20.     On January 11, 2022, the United States District Court for the Northern District of Oklahoma issued a search warrant authorizing the search of information associated with the email account regbennett@blueskytraders.com, that is stored at premises controlled by Oath Holdings, Inc. ("Oath Holdings").

21.     On or about February 4, 2022, I received the information associated with the account identified as regbennett@blueskytraders.com from Oath Holdings.

22.     Included in the production from Oath Holdings was an email exchange from August 2021 between WADE (WWADE@SAGRPLLC.COM) and BENNETT (RBENNETT@EWIMC.NET), with SUBRMANIAM (SEELAN@EWIMC.NET) and others copied.  During the exchange, WADE instructs BENNETT to refrain from acting as a representative of SAG.

23.     An email dated August 9, 2021, from WADE (WWADE@SAGRPLLC.COM) to BENNETT (RBENNETT@EWIMC.NET) with SUBRAMANIAM (SEELAN@EWIMC.NET) and others copied titled, "Cease & Desist use of our SAG property until further notice", includes the following message:

> Reg & Seelan,
>
> It has come to our attention that your East-West International has misappropriated our intellectual property, misrepresented our services, partners, past performance, concept of operations, pans [sic] and operations.
> And you've misrepresented your access to Ministry level officials, in what appears you're using a cut out.
> Like the first encounter, we've not been given the full picture, nor all the facts.
>
> Worse, you've partnered with another SAG company, clearly not ours, linked to their website, and assigned our company property to another company.
> This appears to be an attempt to mislead any buyers of services, based off the hard work of our service.

Cease & desist use of our company name, likeness and use of our partners' names, intellectual property, our proprietary plans and operations, our past performance, or anything to do with our company SAG, LLC,

Explain yourself.

24.   An email dated August 13, 2021, from BENNETT (RBENNETT@EWIMC.NET)

to WADE (WWADE@SAGRPLLC.COM) with SUBRAMANIAM (SEELAN@EWIMC.NET)

and others copied titled, "contract with Vietnam", includes the following message:

Hi Bill,

We are close to signing a contract with Vietnam. We should have it together by middle of next week.

I wanted to ask – do you have a list of information that you need us to collect prior to departure? I suspect you need contact information for the Minister of Health, Director of the Covid response – address for your first meeting, etc.

Do you have anything formal which we can use to begin collecting now to simplify the process on your side?

25.   WADE (WWADE@SAGRPLLC.COM) responds in an email dated August 14,

2021,   to   BENNETT   (RBENNETT@EWIMC.NET)   with   SUBRAMANIAM

(SEELAN@EWIMC.NET) and others copied, stating:

Reg,

I asked you to cease and desist all efforts involving our company SAG, given the uncertainty involving the potential fraudulent presentation of our services. You are not authorized to represent us for projects.  You never answered my questions and we are still assessing risk/damage.

26.   Also included in the production from Oath Holdings was an email from September

2021   from   WADE   (WWADE@SAGRPLLC.COM)   to   BENNETT

(REGBENNETT@BLUESKYTRADERS.COM)   with   SUBRAMANIAM

14

(SEELAN@EWIMC.NET) and others copied.  In the message, WADE referred to his lobbying efforts for Federal approval of the donation of surplus doses.

27.     Also included in the production from Oath Holdings was an email exchange from October 2021 between WADE (WWADE@SAGRPLLC.COM) and BENNETT (REGBENNETT@BLUESKYTRADERS.COM) with SUBRAMANIAM (SEELAN@EWIMC.NET) and others copied.  During the exchange, WADE instructed BENNETT that Federal approval to donate surplus doses was still necessary.

28.     An email dated October 1, 2021, from BENNETT (REGBENNETT@BLUESKYTRADERS.COM) to WADE includes the following message:

> Hi Bill,
> The Republic of Uganda is asking if the SAG team can arrive on Tuesday, October 12th.
> Your team will be welcomed at the airport by Uganda's President, Yoweri Museveni and Dr. Jane Aceng, the Ministry of Health for Uganda.

29.     An email dated October 1, 2021, from WADE (WWADE@SAGRPLLC.COM) to BENNETT (REGBENNETT@BLUESKYTRADERS.COM) with SUBRAMANIAM (SEELAN@EWIMC.NET) and others copied titled, "Re: Uganda Update – SAG team proceed to Uganda.", includes WADE's response:

> Reg,
>
> We can go…. But I've made it 110% clear we STILL DO NOT have Federal approval to donate surplus expiring doses.
>
> Having a Head of State & a cabinet minister greet our guys at the airport is just begging for problems.  It's unwanted attention for a team that doesn't do attention.
>
> What happens if we get there, come back with our assessment, and there's still no Federal approval to get donated doses sent there ? [sic]
> I've told you not to go soliciting business on behalf of SAG, and you ignored that.
>
> Now it seems you've promised all these countries things that aren't yet available, in our name.

I'm not sure we want to touch this money, not get USG approval, and end up entangled with accusations.

I need to directly liaise with the Ugandans that IF we come, there is still a risk that we are dependent upon Federal approval to release surplus expiring doses.

30.     Based on the above information regarding representations made to foreign officials in Vietnam, Australia, Trinidad and Tobago, and Honduras, and potentially other foreign governments (e.g., Philippines), as well as information from the Senior Policy Advisor for Global COVID-19 Response at the White House (discussed above in paragraph 9) and representatives from Pfizer (discussed above in paragraph 10) and Johnson & Johnson (discussed above in paragraph 17), it is evident that EWI does not, and never did, have the authority and capability to provide donations of U.S. Government-owned COVID-19 vaccine to foreign governments. Further, based on the information that WADE may have been at the same time trying to lobby the White House into permitting such donations, coupled with the numerous statements from WADE that Federal approval was still required, it is also evident that SUBRAMANIAM and BENNETT must have known that EWI did not have authority to enter into such agreements with foreign governments.

**Border Search of SUBRAMANIAM at Dallas/Fort Worth International Airport**

31.     On or about May 18, 2022, SUBRAMANIAM left the United States on an outbound flight from Dallas Fort Worth International Airport (DFW). Prior to his departure, Customs and Border Patrol (CBP) conducted a secondary screening of SUBRAMANIAM, during which he represented that he was traveling on business for his companies, EWI and Green Hill Ventures LLC. SUBRAMANIAM reported 11715 South Fulton Ave., Tulsa, OK 74137 as his

address and (918) 906-3720 as his phone number.  Law enforcement database checks identified T-Mobile as the service provider for this number from January 2021 to present.

32.     On or about June 3, 2022, SUBRAMANIAM was referred for secondary inspection at DFW.  Three mobile phones, a laptop, and thumb drive that SUBRAMANIAM was traveling with (the "SUBJECT DEVICES") were detained by HSI Dallas pursuant to border search authority.

33.     On June 6, 2022, the items were received by HSI Baltimore.

34.     On June 16, 2022, the United States District Court for the District of Maryland issued a search warrant authorizing the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data since January 1, 2021 that constitutes evidence of the Subject Offenses.

35.     Included on the laptop was an e-mail SUBRAMANIAM sent from **SUBJECT ACCOUNT-1** to himself (SEELAN@EWIMC.NET) on June 14, 2021, with the subject, "Document from Seelan S".

36.     Attached to the message was a Word document entitled, "PRIVATE – Allocation Update June 14, 2021 DO NOT SHARE", that included contact information for EWI, SUBRAMANIAM, and BENNETT (8023 E. 63rd Pl, Suite 540, Tulsa, OK 74133, USA; SEELAN@EWIMC.NET (918) 901-9501; RBENNETT@EWIMC.NET (405) 208-1060).  The available properties of the Word document identified BENNETT as the author and last to modify, both on June 14, 2021.

37.     The document on EWI letterhead, dated June 11, 2021, stated, in part,

**PRIVATE** – INFORMATION UPDATED – JUNE 11, 2021 – **PRIVATE**

*DO NOT SHARE – INTERNAL DOCUMENT*

17

**US Based Vaccines**

<u>**Johnson & Johnson, Janssen**</u>                                        <u>**MADE IN THE USA**</u>

Government to Government Sale (No Private Party Sales available at this time).

<u>**Requires (see attached) –**</u>

- If direct from a Government Entity - Letter of Intent (LOI) or Purchase Order (PO).

- If Government has authorized a private buyer – include a Letter of Authorization (LOA).

- Pricing (G-to-G) -     Our SALES Price - $14.50 (FOB, USA)

     $13.00 – includes $1 commission

     $ .65 cents – mandate/ $.25 cents intermediary

     SET-PRICE – Cannot increase. May be reduced at J&J discretion.

     **Our COST - $13.00 / EWI Commissions - $1.60**

<u>Availability</u> –

- Ten (10) million available in 3 to 4 weeks upon completion of documents.

- Twenty-five (25) million available monthly thereafter.

  o  Larger orders can be fulfilled over several months.

  o  G to G orders can be placed by Federal Governments, Cities or Municipalities.

- Continuing production available.  Storage Temps – 2 to 8 C (35 to 46 F)

<u>**Pfizer**</u>                                                        <u>**MADE IN THE USA**</u>

Government to Government Sales (No Private Party Sales available at this time)

<u>**Requires (see attached) –**</u>

- If direct from a Governmental Entity - Letter of Intent (LOI) or Purchase Order (PO).
- If Government has authorized a private buyer – include a Letter of Authorization (LOA).
- Pricing (G-to-G) -     Our SALES Price - $21.75 (FOB, USA)

  $20.00 includes no commission

  $.35 cents – mandate/ $.15 cents intermediary

  Mandate can add $1 to price for added commissions (Max $22.75).

  **Our COST - $20.00 / EWI Commissions - $1.25**

Availability –

- Ten (10) million available in 3 to 4 weeks upon completion of documents.
- 10m available monthly thereafter.
  - Larger orders can be fulfilled over several months.
  - G to G orders can be placed by Federal Governments, Cities or Municipalities.
- Continuing production available.  Long Term Storage Temps – 70 C (-94 F). *Requires Cold Storage*. Undiluted, thawed vaccine can be stored for 30 days at Storage Temps – 2 to 8 C (35 to 46 F)


38.     On or about February 10, 2023, Google provided registration information for **SUBJECT ACCOUNT-1** in response to legal process confirming 8023 E. 63rd Place, 540, Tulsa, OK 74133 as the client address, and **SUBJECT ACCOUNT-1** as email accounts created in "gmail.com" domain, associated with the client, SUBRAMANIAM.

39.     In addition, the location of the IP address associated with the account's creation date, March 16, 2012, is Tulsa, Oklahoma.

40.     As such there is probable cause to believe that the items listed in Attachment B which constitute evidence of a crime, in violation of the Subject Offenses, are located within **SUBJECT ACCOUNT-1** and others yet unknown. I believe located within this account will be other emails identifying, outlining, and describing activity related to the Subject Offenses. I base my beliefs on my training and experience and the facts of this case.

41.     Based on my training and experience, I know that individuals engaged in the business of offering goods and services commonly use computers and computing devices to access the internet and email accounts to coordinate the purchase, sale, shipment, and delivery of items. This is particularly true where, as here, the planning and execution of the conduct required the use of electronic means to facilitate communication with individuals in different states and countries. Further, the investigation has shown that computers and electronic communications methods were required to disseminate the solicitation for payment and the particulars of the plan.  Further, based on my training and experience, individuals involved in such plans will often keep records of such transactions contained within their email accounts.  The particular facts of this investigation show that email has likely been a critical means of communication for SUBRAMANIAM, BENNETT, and others, to include by drafting and soliciting emails to identify and obtain victims of the fraud, disseminating records used to substantiate the fraud plan, and soliciting payment of funds from unwitting overseas victims.

42.     Based on my training and experience, I know that individuals engaged in the business of offering goods and services commonly maintain records of that activity, and that this

is particularly the case when the business involves the import or export of such items.[7]  In addition, I also know that the Internal Revenue Service requires businesses to retain records, such as purchases and sales receipts, for as long as they may be needed for the administration of any provision of the Internal Revenue Code, which is typically three years; and that individuals involved in the importation or exportation of prohibited items will often falsely represent certain shipping details such as the shipper's name, description, and value of the imported merchandise to avoid detection and seizure by U.S. Customs and Border Protection (CBP).  Additionally, I know that the above-referenced records are often maintained at/on the individual's residence, place of business, and/or electronic communications devices.

43.     Based on my training and experience, I know that individuals engaged in internet sales typically accept payment via credit card processing services and/or PayPal, an online money transfer service, and they keep records of finances concerning the payments and transfers of money earned or spent in the sale or purchase of items.  Often, these online money transfers generate automatic email notifications.

44.     Based on my training and experience, I know that individuals who utilize online money transfer services as a payment mechanism will often keep or maintain electronic business records and these business records are most often maintained in their email account(s) utilized to receive payments from online money transfer services.  I also know that these individuals will often also utilize these email accounts to communicate with customer complaints, as well as communicate with their suppliers and customers, who are often located in foreign countries.

---

[7]     All importers and exporters are required under 19 U.S.C. § 1508 to maintain records of importation or exportation for a period of five years.

## BACKGROUND CONCERNING EMAIL

45.     In my training and experience, I have learned that GOOGLE provides a variety of online services, including email access, to the public.  GOOGLE allows subscribers to obtain email accounts at the domain name "gmail.com," like the email account listed in Attachment A. Subscribers obtain an account by registering with GOOGLE.  During the registration process, GOOGLE asks subscribers to provide basic personal information.  Therefore, the computers of GOOGLE are likely to contain stored electronic communications (including retrieved and unretrieved email for GOOGLE subscribers) and information concerning subscribers and their use of GOOGLE services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

46.     In my training and experience, I have learned that the services GOOGLE offers to subscribers with GOOGLE accounts include Gmail, Google Search, Google Chrome, YouTube, Google Voice and Hangouts, Blogger, Google+, Android, Google Calendar, Google Keep, Google Photos, Google Drive, Google Docs, Google Cloud Print, Google Pay, and Google Maps.  Gmail is a web-based email service that allows users to send and receive emails and to store sent and received emails.  Google Search is an internet search engine that is freely accessible through the internet.  Google Chrome is a web browser, a software application used to access information on the internet.  YouTube is a free video sharing website that allows users to upload, view and share videos.  Google Voice and Hangouts are GOOGLE's voice and video calling and conferencing, voicemail transcription, and text messaging services.   Blogger is GOOGLE's free weblog publishing tool for sharing text, photos, and video.  Google+ is a forum to share photos, videos,

and other information with other users.  Android is GOOGLE's open-source operating system used for mobile devices.  Google Calendar is a time-management and scheduling service.  Google Keep is a note-taking service.  Google Photos stores images for a broad range of GOOGLE products.  Google Drive is GOOGLE's online storage service for a wide range of file types.  Google Docs is a web-based word processor offered as part of the Google Drive service.  Google Cloud Print allows users to print documents from any device on which the necessary software is installed or accessible.  Google Pay is an online payment system.  Google Maps is a mapping service that allows users to obtain travel directions, information about traffic conditions, and business listings, and includes My Maps, a feature that allows users to create custom maps for personal use or sharing.  GOOGLE stores on computer servers under its control for an indefinite period of time GOOGLE account subscriber information, the contents of communications and documents made and/or stored through GOOGLE services (including the contents of emails), information concerning access to GOOGLE accounts and services, user contacts lists, and search, browsing, and location history.

47.     A GOOGLE subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by GOOGLE.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, emails in the account, and attachments to emails, including pictures and files.

48.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment

(including any credit or bank account number).  In my training and experience, such information

may constitute evidence of the crimes under investigation because the information can be used to

identify the account's user or users.  Based on my training and my experience, I know that, even

if subscribers insert false information to conceal their identity, this information often provides

clues to their identity, location, or illicit activities.

49.     In my training and experience, email providers typically retain certain transactional

information about the creation and use of each account on their systems.  This information can

include the date on which the account was created, the length of service, records of log-in (i.e.,

session) times and durations, the types of service utilized, the status of the account (including

whether the account is inactive or closed), the methods used to connect to the account (such as

logging into the account via the provider's website), and other log files that reflect usage of the

account.  In addition, email providers often have records of the Internet Protocol address ("IP

address") used to register the account and the IP addresses associated with particular logins to the

account.  Because every device that connects to the Internet must use an IP address, IP address

information can help to identify which computers or other devices were used to access the email

account.

50.     In my training and experience, in some cases, email account users will

communicate directly with an email service provider about issues relating to the account, such as

technical problems, billing inquiries, or complaints from other users.  Email providers typically

retain records about such communications, including records of contacts between the user and the

provider's support services, as well as records of any actions taken by the provider or user as a

result of the communications. In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the

account's user or users.

51.     As explained herein, information stored in connection with an email account may

provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct

under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the IP addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

52.     Based on the forgoing, I request that the Court issue the proposed search warrant.

53.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law-enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on GOOGLE. Because the warrant will be served on GOOGLE, who will

then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

### REQUEST FOR SEALING

54.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that it neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.


JEFFREY MASIAK, Special Agent
HOMELAND SECURITY
INVESTIGATIONS


Affidavit submitted by email and attested to me
as true and accurate by telephone consistent with
Fed. R. Crim. P. 4.1 and 41(d)(3) this 22nd day of
February, 2023.


HONORABLE CHRISTINE D. LITTLE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the account identified as

SEELAN8002@GMAIL.COM (SUBJECT ACCOUNT-1) that is within the possession, custody,

or control of GOOGLE ("Provider"), a company with offices located at 1600 Amphitheatre

Parkway, Mountain View, CA 94043, that accepts service of legal process through its Law

Enforcement Request System.

## **ATTACHMENT B (Google)**

## **ITEMS TO BE SEIZED**

**I.      INFORMATION TO BE PRODUCED BY GOOGLE LLC BETWEEN JUNE 14, 2021 AND PRESENT**

1.      To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A.      The contents of all emails associated with the accounts, including stored or preserved copies of emails sent to and from the accounts, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email from June 14, 2021 through and including the present (unless otherwise specified);

B.      OneDrive files created, accessed, or owned by the accounts listed in Attachment A;

C.      All records or other information stored by an individual using the accounts, including address books, contact and buddy lists, calendar data, pictures, member profile, and files;

D.      All transactional information of all activity of the electronic mail addresses described above in Section I(a)-(c), including log files, dates, times, methods of connecting, ports, dial ups, and/or locations;

1

E.      All records or other information regarding identification associated with the accounts listed in Attachment A, to include application, registration details, full name, physical and/or billing address, telephone numbers and other identifiers, records of session times and durations, the date(s) on which the accounts listed in Attachment A were created, the length of service, the types of service utilized, the IP address used to register the accounts listed in Attachment A, log-in IP addresses associated with session times and dates, accounts status, alternative e-mail addresses provided during registration, all profiles and screen names associated with subscribers and/or accounts, all account names associated with the subscriber, methods of connecting, log files, means and source of payment (including any credit or bank account numbers), and detailed billing records;

F.      All images, videos and other files, and associated upload/download date and timestamp, including all available metadata concerning these files associated with the accounts listed in Attachment A;

G.      All records pertaining to communications between the Provider and any person regarding the accounts listed in Attachment A, including contacts with support services and records of actions taken, and/or communication regarding the status of the accounts;

H.      Payment information, including billing addresses, shipping addresses, and payment instruments, associated with any Google services used by the accounts listed in Attachment A.

The Provider is hereby ordered to disclose the above information to the government **within 14 days** of service of this warrant.

GOOGLE shall deliver the information set forth in Section I to:

DHS/HSI
Special Agent Jeffrey Masiak

2

40 S. Gay Street
Room 324
Baltimore, MD 21202
Phone: 410-779-2545
Fax: 410-962-3469
Jeffrey.S.Masiak@hsi.dhs.gov

## II.    INFORMATION TO BE SEIZED BY THE GOVERNMENT

All information described above in Section I that constitutes evidence of violations of Title 18, United States Code, Section 1343 (wire fraud); and Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud) (collectively, the "Subject Offenses"), and occurring between June 14, 2021 and the present, including, for the accounts or identifiers listed on Attachment A, information pertaining to the following matters:

A.    Information relating to who created, accessed, or used the accounts listed in Attachment A, including records about their identity (or identities) and whereabouts.

B.    All documents and electronic communication identifying WADE, SUBRAMANIAM, and BENNETT's affiliation(s), work products, and/or payments and/or remuneration by any foreign government.

C.    Evidence of communication between and among WADE, SUBRAMANIAM, BENNETT, and any other individual relating to the donation of COVID-19 vaccine and/or the fulfillment of contracts sought or obtained with foreign governments, foreign institutions, or agents thereof.

D.    All documents and electronic communication relating to contracts or other agreements between WADE, SUBRAMANIAM, and/or BENNETT with the U.S. or any foreign governments.

E.    All documents and any other digital correspondence between WADE, SUBRAMANIAM, and/or BENNETT and any identifiable official, entity or affiliate of any foreign government, or any person or entity acting on behalf of any foreign government,

3

including any corporation or other business entity established under the laws of any foreign government.

F.      All documents and electronic communication identifying WADE, SUBRAMANIAM, and/or BENNETT's duty to report outside activities to the U.S. government.

G.      Evidence of false statements and omissions made on any official form submitted to the U.S. government.

H.      Evidence that SUBRAMANIAM, BENNETT, or anyone acting on their behalf, used interstate wires, mail, or other instrumentalities of interstate commerce to further a fraudulent scheme.

I.      Evidence of communications between SUBRAMANIAM, and/or BENNETT and any other individual, containing preparatory steps taken in furtherance of a conspiracy to commit the Subject Offenses, including the use of interstate wires or other instrumentalities of interstate commerce to commit the Subject Offenses.

J.      Evidence indicating how and when the accounts listed in Attachment A were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the accounts listed in Attachment A.

K.      Evidence indicating the state of mind of the owner(s) of the accounts listed in Attachment A as it relates to the crimes under investigation.

L.      The identity of the person(s) who created or used the accounts listed in Attachment A, including records that help reveal the whereabouts of such person(s).

M.      All images, messages, and communications regarding wiping software, encryption, or other methods to avoid detection by law enforcement.

N.    Passwords and encryption keys, and other access information that may be necessary to access the accounts listed in Attachment A or identifier(s) and other associated accounts.

O.    Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the accounts listed in Attachment A.

P.    Information relating to the transfer of funds, including records related to Western Union, MoneyGram, and PayPal receiver information, wire transfer records, and emails discussing the transfer of money.

## III.    GOVERNMENT PROCEDURES FOR WARRANT EXECUTION

With respect to the search of the information provided pursuant to this warrant by the above-referenced provider, law-enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law-enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.  The investigative team may continue to review any information not segregated as potentially privileged.